# United States Court of Appeals for the Federal Circuit

---

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.,**
*Plaintiff,*

v.

**ENTERGY NUCLEAR INDIAN POINT 2, LLC,**
*Plaintiff-Cross Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2010-5155, -5157

---

Appeals from the United States Court of Federal Claims in consolidated case nos. 03-CV-2622 and 04-CV-033, Judge Thomas C. Wheeler.

---

Decided: April 16, 2012

---

ALEX D. TOMASZCZUK, Pillsbury Winthrop Shaw Pittman LLP, of McLean, Virginia, argued for plaintiff-cross appellant. With him on the brief were JAY E. SILBERG and EVAN D. WESSER, of Washington, DC. Of counsel on the brief was L. JAGER SMITH, JR., Wise Carter Child Caraway, P.A., of Jackson, Mississippi.

ANDREW P. AVERBACH, Senior Trial Counsel, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, ALAN J. LO RE, Assistant Director. Of counsel on the brief were PATRICK B. BRYAN, SCOTT SLATER and SHARI A. ROSE, Trial Attorneys; and JANE K. TAYLOR, Office of General Counsel, United States Department of Energy, of Washington, DC.

_____

Before LINN, DYK, and PROST, *Circuit Judges.*

DYK, *Circuit Judge.*

This case involves the federal government's breach of its commitment to dispose of spent nuclear fuel. On appeal, there is no dispute as to the government's liability. However, the government and Entergy Nuclear Indian Point 2, LLC ("ENIP") separately appeal the decision of the Court of Federal Claims ("Claims Court") with respect to damages. *See Consol. Edison Co. of N.Y., Inc. v. United States*, 92 Fed. Cl. 466 (2010). The government appeals the Claims Court's award of two categories of damages: (1) ENIP's Unit 1 wet storage costs for the continued operation of its Unit 1 spent fuel pool; and (2) regulatory fees paid to the United States Nuclear Regulatory Commission ("NRC"). For the reasons discussed below, we reverse the Claims Court's award of damages for ENIP's Unit 1 wet storage costs and ENIP's NRC fees.

ENIP cross appeals the Claims Court's denial of damages for: (1) ENIP's indirect overhead costs associated with its mitigation activities; and (2) ENIP's cost of financing its mitigation activities. The issues on cross appeal are controlled by our recent precedents, which

were not available to the Claims Court at the time of its decision. These recent precedents require that we reverse the denial of ENIP's overhead costs, and that we affirm the denial of ENIP's cost of capital.

BACKGROUND

In 1983, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. No. 97-425, 96 Stat. 2201 (1983) (codified as amended at 42 U.S.C. §§ 10101-10270 (2006)). The NWPA authorized the Department of Energy ("DOE") to enter into contracts with nuclear facilities for the disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"). 42 U.S.C. § 10222. Pursuant to its authority under the NWPA, the Department of Energy promulgated regulations defining the terms of a Standard Contract to be executed with nuclear facilities. *See id.* § 10222(a)(6); Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 10 C.F.R. § 961.11 (1983) (hereinafter "Standard Contract"); *see also* 48 Fed. Reg. 5,458 (Feb. 4, 1983) (proposed rule); 48 Fed. Reg. 16,590 (Apr. 18, 1983) (final rule). Congress expressly mandated that, under the terms of the Standard Contract, DOE dispose of SNF and HLW "beginning not later than January 31, 1998." 42 U.S.C. § 10222(a)(5).

In June 1983, DOE entered into a Standard Contract with Consolidated Edison Company of New York, LLC ("Consolidated Edison") under which DOE agreed to accept SNF stored at Unit 1 and Unit 2 of Consolidated Edison's Indian Point facility.[1]

---

[1]    Indian Point includes three units. Because Unit 3 is not at issue in this appeal, Unit 1 and Unit 2 are collectively referred to as the "Indian Point" facility.

Under the Standard Contract, each contracting nuclear utility would receive yearly allocations for the acceptance of SNF by DOE based on two factors: (1) DOE's projected total receiving capacity for the year; and (2) an acceptance priority based on the respective ages of each utility's stored SNF, with the oldest fuel having the highest priority. *See* 10 C.F.R. § 961.11; *see also Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1285-86 (Fed. Cir. 2008). Though DOE published multiple capacity reports prior to 1998, we have previously determined that DOE's obligations under the Standard Contract are based on allocations calculated according to an Annual Capacity Report ("ACR") that DOE published in 1987. *Pac. Gas*, 536 F.3d at 1292. Based on the Standard Contract's priority scheme and DOE's projected receiving capacity under the 1987 ACR, DOE was obligated to accept the following amounts of SNF from the Indian Point facility: 30.58 metric tons uranium ("MTU") in 1998; 32.74 MTU in 1999; 27.0 MTU in 2000; 0 MTU in 2001; 28.29 MTU in 2002; 24.42 MTU in 2003; 33.80 MTU in 2004; 63.51 MTU in 2005; and 31.07 MTU in 2006.

DOE failed to begin accepting and disposing of SNF from Consolidated Edison and other utilities in the nuclear industry by January 31, 1998. On November 9, 2000, Consolidated Edison entered into an Asset Purchase and Sale Agreement with ENIP for the sale of Unit 1 and Unit 2 of the Indian Point facility. The sale closed on September 6, 2001. As Consolidated Edison's successor, ENIP assumed Consolidated Edison's rights and obligations under the Standard Contract, with the exception of claims related to the DOE's breach under the Standard Contract that accrued as of September 6, 2001.

As a result of DOE's breach, ENIP constructed an on-site dry-storage facility, otherwise known as an Independent Spent Fuel Storage Installation ("ISFSI") in the

period leading up to 2008, to provide for the long-term storage of SNF from Unit 1 and Unit 2. ENIP filed an action in the Claims Court for damages caused by DOE's failure to collect and dispose of SNF generated at Indian Point, including the costs incurred in connection with ENIP's mitigation activities.[2]

We have previously held that DOE's failure to begin collecting SNF constituted a partial breach of the Standard Contract. *Me. Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("The breach involved all the utilities that had signed the contract—the entire nuclear electric industry."); *see also N. States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000). Consistent with *Maine Yankee*, the Claims Court granted summary judgment to ENIP on the government's liability for a partial breach of contract. *See Consol. Edison*, 92 Fed. Cl. at 474.

In light of the liability determination, the government conceded that ENIP's construction of the dry-storage facility was a proper mitigation activity, and did not dispute $89,388,884 of ENIP's claims related to the construction of the dry-storage facility at Indian Point. *See Consol. Edison*, 92 Fed. Cl. at 502. The government did dispute what are now four categories of damages claimed by ENIP.[3] As to these categories, the government argued

---

[2] ENIP's claims against the government were joined with those of its predecessor, Consolidated Edison, for trial and decision. *See Consol. Edison*, 92 Fed. Cl. at 473. The issues involved in this appeal, however, are based solely on ENIP's claims against the government.

[3] The government also disputed sixteen other categories and subcategories of damages before the Claims Court that are not on appeal, some of which were awarded and some of which were denied. *See Consol. Edison*, 92 Fed. Cl. at 504-19.

that they would have been incurred even if DOE had begun collecting SNF in 1998, or they were otherwise not related to DOE's breach of the Standard Contract. *Id.* In resolving the disputed claims, the Claims Court awarded ENIP $7,660,038 in damages related to the costs of operating Unit 1's spent fuel pools after ENIP purchased Indian Point in 2001. *Id.* at 504-05. The Claims Court also awarded ENIP $2,148,901 in damages related to its claimed increase in regulatory fees paid to the NRC. *Id.* at 513-16. The Claims Court denied, however, ENIP's claim of $6,894,662 in damages for certain overhead costs related to its mitigation activities, *id.* at 517-18, and ENIP's claim of $20,838,626 in damages for the cost of capital to fund its mitigation activities, *id.* at 518-19. These four categories of damages are discussed in further detail below. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review legal conclusions of the Claims Court de novo. *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). Factual findings are reviewed for "clear error." *Id.*

### I  Unit 1 Wet Storage Costs

The government appeals the Claims Court's award of $7,660,038 in damages related to the costs of operating Unit 1's spent fuel pool after ENIP purchased Indian Point in 2001. *See Consol. Edison*, 92 Fed. Cl. at 504-05. The Unit 1 costs included $6,745,093 for the operation and maintenance of the Unit 1 spent fuel pool from 2004 to 2008,[4] when the spent fuel was moved into the dry-

---

[4] ENIP also claimed damages for the operation and maintenance of the Unit 1 spent fuel pool for 2002 and 2003, but those claims were denied by the Claims Court

storage facility constructed by ENIP, and $914,945 in costs attributed to the repair of Unit 1's north curtain drain, necessary to address a leak in Unit 1's spent fuel pool. *Id.*

In *Yankee Atomic Electric Co. v. United States*, we explained that "damages for breach of contract require a showing of causation," which in turn necessitates a "comparison between the breach and non-breach worlds." 536 F.3d 1268, 1273 (Fed. Cir. 2008). Thus, "a plaintiff seeking damages must submit a hypothetical model establishing what its costs *would have been* in the absence of breach." *Energy Nw. v. United States*, 641 F.3d 1300, 1305 (Fed. Cir. 2011) (emphasis added).

Here, ENIP's hypothetical model contemplated that if DOE had not breached the Standard Contract, the SNF stored in the Unit 1 spent fuel pool would have been removed in 1998.[5] Thus, ENIP argues, in a non-breach world, ENIP would not have incurred any costs related to the continued operation of the Unit 1 spent fuel pool after acquiring Indian Point in 2001. The Claims Court agreed. *Consol. Edison*, 92 Fed. Cl. at 502-03.

The problem with ENIP's theory is that it does not reflect the fact that in the non-breach world, Unit 2 SNF, rather than Unit 1 SNF, would have been removed from Indian Point in 1998, when Consolidated Edison still owned the Indian Point facility. Some background is helpful. After a nuclear fuel assembly is no longer useful for generating electricity, the nuclear fuel is considered

---

due to a lack of records to sufficiently establish the alleged costs for those years. *Consol. Edison*, 92 Fed. Cl. at 504.

[5]    The Unit 1 spent fuel pool contained 30.58 MTU of SNF, matching Indian Point's 30.58 MTU allocation rights for 1998 as calculated based on the 1987 ACR.

spent, and the SNF is discharged from the reactor into a spent fuel pool where it must be cooled for at least several years. The Unit 1 reactor ceased operating in 1974, and no additional SNF was added to the Unit 1 pool after that time. Dr. Henri Gueron, the Director of Nuclear Fuel Supply for Consolidated Edison and the designated point of contact between Consolidated Edison and DOE, testified at trial that because the Unit 1 reactor had ceased operating, and the Unit 1 spent fuel pool was "static," Consolidated Edison was "not concerned about . . . room in that particular pool." J.A. 133. In contrast to Unit 1, the Unit 2 reactor began operating in 1974 and continues to operate today. Because the Unit 2 reactor continued to generate SNF that needed to be discharged into the Unit 2 spent fuel pool, Consolidated Edison preferred to use its allocation rights under the Standard Contract to have older Unit 2 SNF removed from the Unit 2 spent fuel pool in order to ensure that there was sufficient space available in that pool for newly discharged SNF from the Unit 2 reactor. Dr. Gueron testified that Consolidated Edison preferred to have DOE accept SNF "from the [Unit] 2 pool" because that was "critical to continue[d] operation" of the Unit 2 reactor. *Id.* Under this approach, the Unit 1 SNF would not have been removed in 1998.

Consolidated Edison's Unit 2 preference is also evidenced by its official communications with DOE. Under the Standard Contract, DOE's contracting officer requested Consolidated Edison to submit Delivery Commitment Schedules ("DCSs") sixty-three months prior to a requested acceptance date that corresponded to its SNF acceptance allocation. Consolidated Edison requested that DOE apply its allocation rights to Unit 2 SNF in each of seven DCSs submitted to DOE between September 23, 1992, and September 14, 2000.

The Claims Court found that Consolidated Edison's Unit 2 preference "[did] not accurately reflect [ENIP]'s views on its fuel management practices if DOE had begun performance as promised" in 1998. *Consol. Edison*, 92 Fed. Cl. at 503. Thus, the Claims Court held that ENIP "was entitled to assume that DOE would collect Unit 1 spent fuel first" beginning in 1998. *Id.* However, when constructing a hypothetical non-breach world, the facts of the case may not be retroactively changed to fit a plaintiff's damages theory. Consolidated Edison still owned the Indian Point facility from 1998 to 2001, and thus ENIP's Unit 1 preference is irrelevant to establishing what "would have been" in a non-breach world during this earlier time frame. ENIP's entire damages theory is premised on the assumption that the Unit 1 SNF would have been removed by *1998.* The "hypothetical model establishing what . . . would have been in the absence of breach" must account for the fact that Consolidated Edison's Unit 2 preference governed which SNF would have been taken from Indian Point. *See Energy Nw.*, 641 F.3d at 1305. There is no basis for assuming that, absent the breach, Consolidated Edison would have changed its election of Unit 2 SNF for Unit 1 SNF even though each request reserved Consolidated Edison's right to change its election and no delivery schedule was ever finalized due to DOE's breach.

ENIP argues in the alternative that, even if the Claims Court erred by not applying Consolidated Edison's preference for 1998 to 2001, any such error was harmless because ENIP could have used its 2002-2004 allocations to remove all of the Unit 1 SNF prior to incurring the Unit 1 wet storage costs awarded by the Claims Court. This alternative theory, however, was not raised before the Claims Court, and may not be raised for the first time on appeal. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126

F.3d 1420, 1426 (Fed. Cir. 1997) ("[T]his court does not 'review' that which was not presented to the [trial] court.").

We reverse the Claims Court's award of $7,660,038 in damages related to the costs of operating Unit 1's spent fuel pool.

## II  NRC Generic Fees

The government also appeals the Claims Court's award to ENIP of $2,148,901 in damages related to regulatory fees paid to the NRC. The NRC is required to recover nearly all of its costs of regulating the nuclear power industry from the licensees that it supervises. *See* 42 U.S.C. § 2214.[6] The NRC recovers the costs of its site-specific activities by charging licensees site-specific fees under 10 C.F.R. Part 170. These site-specific activities include items such as reviewing license applications and conducting inspections. *See* 10 C.F.R. § 170.12. Whether or not the government's breach resulted in site-specific fee increases, ENIP's claims before the Claims Court did not include any alleged increase in Part 170 site-specific fees, and any increase in such fees is not an issue in this appeal.

The issue here concerns a second category of NRC fees, which cover the costs of NRC's general industry-wide

---

[6]    At the time of the 1999 change to the NRC fee structure, NRC was required to recover 100% of its costs through regulatory fees. *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 6101, 104 Stat. 1388, 1388-298, *amended by* Pub. L. No. 106-377, Title VIII, 114 Stat. 1441, 1441A-86 (2000). Subsequently, the percentage of the costs that that NRC was required to recover was incrementally reduced from 98% in 2001 down to 90% in 2005 and thereafter. *See* 42 U.S.C. § 2214(c)(2) (2006).

regulatory activities. These are the "generic fees" required by 10 C.F.R. Part 171. The generic fees cover the costs of activities such as the development and provision of regulatory guidance, "research," and "[o]ther safety, environmental, and safeguards activities." 10 C.F.R. § 171.15.

ENIP claims that its generic fees paid from 2002 to 2008 increased as a result of DOE's breach.[7] There are two possible bases upon which ENIP could establish a causal link between DOE's breach and an increase in generic fees paid by ENIP: (1) that NRC's overall generic costs increased as a result of DOE's breach, causing the NRC to assess increased generic fees on each of its licensees; or (2) that a 1999 rule changed the fee allocation method as a result of DOE's breach and increased ENIP's share of generic fees.

With respect to the first possible basis, the Claims Court found that it was "logical to assume that increased regulatory oversight would occur if nuclear plant owners were forced to store more spent fuel on their premises due to DOE's breach," apparently concluding that generic fees would increase as a result. *Consol. Edison*, 92 Fed. Cl. at 514.[8] However, ENIP does not point to any evidence in

---

[7]    We have previously considered the 1999 rule change in *Boston Edison Co. v. United States*, 658 F.3d 1361, 1367-70 (Fed. Cir. 2011). However, in *Boston Edison*, the government did not contest, and we did not reach, the underlying issue of whether DOE's partial breach of the Standard Contract caused the generic fees assessed on the plaintiff to increase. *See id.* at 1368.

[8]    The Claims Court statement that "[a]bsent DOE's breach, the NRC most likely would not have modified its fee structure, because the number of dry storage facilities would have been too few to warrant any change," *Consol. Edison*, 92 Fed. Cl. at 515, relates to the variable costs attributable to increased dry storage; there is no reason to

the record establishing that NRC's generic activity costs increased as a result of DOE's breach. At oral argument, ENIP conceded that it had no evidence that the NRC's generic-activity costs had increased after the breach. Oral Argument at 31:44, *Consolidated Edison Co. of N.Y. v. United States*, No. 2010-5155, -5157 (Fed. Cir. Jan. 9, 2012), *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/search/audio.html (search "Appeal Number" for "2010-5155").[9] ENIP has not established that the NRC's overall generic fees increased as a result of DOE's breach.

The second possible basis for establishing a causal link between ENIP's generic fees and DOE's breach is that the NRC changed its rules for allocating generic fees as a result of DOE's breach, and that this change increased ENIP's share of the overall generic fees.

Among the various types of generic fees charged to NRC licensees under 10 C.F.R. Part 171 are those related to nuclear plant decommissioning, wet storage, and dry storage. Before 1999, the NRC charged an annual generic fee to all licensees operating nuclear reactors to cover the NRC's general expenses related to wet storage and nuclear plant decommissioning. Before 1999, the NRC also charged a separate annual generic fee to all licensees with dry storage facilities to cover the NRC's generic expenses related to dry storage. The 1999 rule change eliminated the separate generic fees for (1) dry storage, and (2) wet storage and decommissioning, and created a new annual

---

assume that overall dry-storage *generic* (e.g., research) costs increased.

[9] Court: "The NRC total, did the Nuclear Regulatory Commission's fees go up? Did their costs go up during the period of the breach?" Counsel for ENIP: "I don't know whether their costs went up your Honor." Oral Argument at 31:44.

Spent Fuel Storage/Reactor Decommissioning ("SFS/RD") fee, which covered the NRC's generic costs related to both dry storage and wet storage as well as decommissioning. Specifically, the annual SFS/RD fee covered "the costs of NRC's generic and other research activities directly related to reactor decommissioning and spent fuel storage (both [wet and dry] storage options), and other safety, environmental, and safeguards activities related to reactor decommissioning and spent fuel storage." Revision of Fee Schedules; 100% Fee Recovery, FY 1999, 64 Fed. Reg. 31,448, 31,455 (June 10, 1999).

ENIP argues that as a result of the reallocation, ENIP's generic fees increased. The 1999 rule change combined the previously separate categories for wet storage and dry storage, and covered the NRC's generic wet-storage costs and generic dry-storage costs with a single SFS/RD fee that applied to all licensees with either wet storage or dry storage on site. ENIP's argument is apparently that, in a non-breach world, the NRC would not have changed its fee structure, and ENIP would not have had to pay the portion of the SFS/RD fee attributable to dry storage from 2002 to 2008, when it did not have a dry storage facility.[10]

_____

[10] As the government points out, the $2,148,901 in damages claimed by ENIP and awarded by the Claims Court includes the portions of the annual SFS/RD fee attributable to both the NRC's wet-storage generic costs and dry-storage generic costs. The government argues that the award does not account for the fact that ENIP would have required wet storage for Unit 2 regardless of DOE's breach, and thus would have paid generic fees related to wet storage regardless of DOE's breach. Because we find that ENIP failed to show that the 1999 rule change was the result of DOE's breach, we do not reach the question of whether ENIP's damages claim improperly compared the breach versus non-breach worlds.

However, ENIP has failed to show that the 1999 rule change was the result of DOE's breach. The NRC's public statements do not suggest that the 1999 changes were the result of DOE's breach. When proposing the 1999 rule change, the NRC expressed multiple concerns behind the rule change that were unrelated to DOE's breach:

> The current policy has raised three concerns: (a) The fee structure could create a disincentive for licensees to pursue dry storage; (b) The fairness of assessing multiple annual fees if a licensee holds multiple [dry storage] licenses for different designs; and (c) Not all affected licensees are being assessed the costs of NRC's generic decommissioning activities.

Revision of Fee Schedules; 100% Fee Recovery, FY 1999, 64 Fed. Reg. 15,876, 15,881 (proposed April 1, 1999). The NRC further explained that "[o]ne purpose of the review" of the fee structure "was to assure consistent fee treatment for both wet storage (i.e., spent fuel pool) and dry storage (i.e., independent spent fuel storage installations (ISFSIs)) of spent fuel." *Id.* at 15,882. "The proposed change would give equivalent fee treatment to both storage options." *Id.*

Though acknowledging DOE's breach, the NRC again expressed its concern over the fairness of its generic fee assessment when issuing the final rule:

> The NRC recognizes that sites will be required to continue to store spent fuel onsite until another solution becomes available. The fact that DOE has not taken possession of the spent fuel does not relieve NRC of the OBRA-90 requirement to recover approximately 100 percent of its budget authority through fees, including those costs associated with generic spent fuel storage activi-

ties. . . . The current policy has raised concerns that the fee structure could create a disincentive for licensees to pursue dry storage. The spent fuel storage/reactor decommissioning annual fee will give equivalent fee treatment to both storage options.

Revision of Fee Schedules; 100% Fee Recovery, FY 1999, 64 Fed. Reg. at 31,455. In sum, the only public statements in the record that were made on behalf of the NRC express a concern over the fairness of the generic fee assessment, and do not establish any direct link between DOE's breach and the 1999 rule change.

In the absence of any public statement from the NRC linking the 1999 rule change to DOE's breach, ENIP points to comments made by NRC Commissioner Merrifield in an internal NRC memorandum accompanying his vote on whether the NRC should, among other things, adopt the 1999 rule change. Commissioner Merrifield noted that the proposed SFS/RD fee "should result in a more even and fair recovery policy for various decommissioning and storage activities." J.A. 2642. Commissioner Merrifield stated further:

> [I]t is unfortunate that the federal government has not provided for permanent disposal of high-level waste. Because of the delay in the DOE high-level waste repository program, I believe the Commission should seek legislation for FY2000 to amend the Nuclear Waste Policy Act so that generic costs associated with the NRC's spent fuel storage activities can be derived from the Nuclear Waste Fund.

*Id.* According to the Claims Court, "[t]hese comments confirm the existence of a direct link between DOE's

breach and the NRC's 1999 fee change." *Consol. Edison*, 92 Fed. Cl. at 515. We disagree.

These comments are insufficient as a matter of law to demonstrate that the new NRC rules were the result of the government breach. We need not decide whether unpublished views of agency members may be considered in determining the reasons for agency action. In any event, Merrifield's comments merely parallel the NRC's stated objective to "give equivalent fee treatment to both [wet and dry] storage options." Revision of Fee Schedules; 100% Fee Recovery, FY 1999, 64 Fed. Reg. at 15882. And while Merrifield's comments explicitly suggest proposing legislation to amend the NWPA because of the government's delay in accepting SNF, it does nothing to suggest that the 1999 rule change was the result of that delay or DOE's breach.[11]

In sum, ENIP has failed to prove either (1) that the NRC's overall generic-activity costs increased as a result of DOE's breach, or (2) that DOE's breach caused the NRC to change its generic fee structure in 1999. Accordingly, ENIP has not established that its generic fees increased as a result of DOE's breach. We reverse the Claims Court's award of $2,148,901 in damages for generic fees paid to the NRC.

### III  Overhead Costs

ENIP cross appeals the Claims Court's denial of $6,894,662 in damages for certain overhead costs related ENIP's mitigation activities. ENIP's parent company,

---

[11]  ENIP also points to the comments made by NRC Commissioner McGaffigan in an internal NRC memorandum accompanying his vote on the 1999 rule change. However, McGaffigan's comments made no mention of DOE's breach.

Entergy Corporation, maintained a separate accounting, referred to as the "capital suspense loader," to capture costs associated with engineering supervision and the administration of capital projects, and to allocate equitable portions of those costs to ENIP's mitigation activity. As ENIP points out, the utilized accounting practices are compliant with the Federal Energy Regulatory Commission's ("FERC") regulations and are also in accordance with Generally Accepted Accounting Principles ("GAAP").

Without the benefit of our recent SNF-related decisions, the Claims Court found that "the method employed to charge time to [the overhead] pools and allocate them to capital projects" was too "imprecise." *Consol. Edison*, 92 Fed. Cl. at 517. However, in *System Fuels, Inc. v. United States*, where the "Plaintiffs used accounting procedures as mandated by FERC and consistent with [GAAP]," we held that the plaintiff's accounting records sufficiently "demonstrate[d] the effect of the mitigation project on the capital pools entitlement with reasonable particularity." 666 F.3d 1306, 1312 (Fed. Cir. 2011) (citation omitted) (internal quotation marks omitted); *see also Boston Edison*, 658 F.3d at 1370 (allowing recovery of "the portion of overhead costs (calculated using GAAP) that was attributable to mitigation projects"); *Energy Nw.*, 641 F.3d at 1309 (allowing recovery for the "portion of [the plaintiff's] overhead costs fairly allocated to support of the mitigation via generally accepted accounting practices").

Consistent with our recent decisions, we reverse the Claims Court's denial of damages for overhead costs allocated to ENIP's mitigation activities via the capital suspense loader.

## IV  Cost of Capital

ENIP also cross appeals the Claims Court's denial of damages for the cost of capital to fund ENIP's mitigation activities.  ENIP seeks to recover $20,838,626 in cost-of-capital damages for the financing of the breach-related projects with its parent company Entergy's own corporate equity and general corporate debt.

In *Energy Northwest*, we held that the no-interest rule barred parties to the Standard Contract from recovering the costs of financing mitigation projects.  641 F.3d at 1310-13 (citing 28 U.S.C. § 2516(a)); *see also Sys. Fuels*, 666 F.3d at 1310-11.  We further explained in *Boston Edison* that the "commercial enterprise exception" to the no-interest rule did not apply in the context of the NWPA. 658 F.3d at 1371.

Consistent with our decisions in *Energy Northwest* and *Boston Edison*, we affirm the Claims Court's denial of ENIP's cost of capital claims.

## AFFIRMED IN PART AND REVERSED IN PART

### COSTS

No costs.