# United States Court of Appeals for the Federal Circuit

—————————

**KANSAS GAS AND ELECTRIC COMPANY,
KANSAS CITY POWER & LIGHT COMPANY,
AND KANSAS ELECTRIC POWER COOPERATIVE,
INC.,**

*Plaintiffs-Appellants,*

**V.**

**UNITED STATES,**

*Defendant-Cross Appellant.*

—————————

2011-5044, -5045

—————————

Appeals from the United States Court of Federal Claims in Case No. 04-CV-099, Judge Christine O. C. Miller.

—————————

Decided: July 12, 2012

—————————

ROBERT L. SHAPIRO, Hughes Hubbard & Reed LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief was DANIEL T. LLOYD.

CHRISTOPHER J. CARNEY, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-cross appellant. With him on the brief were TONY WEST,

Assistant Attorney General, JEANNE E. DAVIDSON, Director, HAROLD D. LESTER, JR., Assistant Director, JAMES P. CONNOR, JEREMIAH M. LUONGO, and LUKE A.E. PAZICKY, Trial Attorneys. Of counsel were ANDREW V. AVERBACH and ALAN J. LO RE. Of counsel on the brief was JANE K. TAYLOR, Office of General Counsel, United States Department of Energy, of Washington, DC.

---

Before RADER, *Chief Judge*, BRYSON and LINN, *Circuit Judges*.

Opinion for the court filed by *Chief Judge* RADER.

Opinion dissenting-in-part filed by *Circuit Judge* LINN.

RADER, *Chief Judge*.

Kansas Gas and Electric Company ("KG&E"), Kansas City Power & Light Company ("KCPL"), and Kansas Electric Power Cooperative, Inc. ("KEPCO") (collectively "the Kansas Companies") suffered damages due to the Government's partial breach of the Standard Contract for Disposal of Spent Nuclear Fuel And/Or High-Level Radioactive Waste ("Standard Contract"). In June 2010, the United States Court of Federal Claims conducted a nine-day trial and awarded the Kansas Companies $10,632,454.83.

In determining the amount of damages, the trial court correctly did not award damages for cost of capital and for the costs associated with researching alternative storage options for spent nuclear fuel ("SNF") and high level radioactive waste ("HLW"). The trial court also appropriately reduced the Kansas Companies' damages by the value of the benefit they received as a result of their mitigation activities. However, the trial court erred by not accepting the Kansas Companies' reasonable method for calculating overhead costs. Therefore, this court

affirms-in-part and reverses-in-part the trial court's damages award.

I.

In 1983, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"). Pub. L. No. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101–10270 (2006)). The NWPA authorized the Department of Energy ("DOE") to enter into contracts for the collection and disposal of SNF and HWL. 42 U.S.C. § 10222(a)(1). The Standard Contract required the owners of SNF and HLW to pay fees into the Nuclear Waste Fund, in exchange for which the DOE would begin to dispose of the SNF and HLW "not later than January 31, 1998." 42 U.S.C. § 10222(a)(5)(B); 10 C.F.R. § 961.11 (2011).

On October 10, 1984, the Kansas Companies entered into the Standard Contract with DOE. *Kan. Gas & Elec. Co. v. United States*, 95 Fed. Cl. 257, 260 (2010) ("*KG & E*"). The Kansas Companies collectively own Wolf Creek Nuclear Operating Corp., which operates the Wolf Creek Generating Station ("Wolf Creek"), a nuclear power plant located near Burlington, Kansas. *Id.* at 262. Wolf Creek's nuclear reactor initially operated with 193 fuel assemblies. *Id.* When fuel assemblies no longer efficiently generate energy, the plant is refueled. The refueling process removes the spent fuel assemblies from the reactor core and places them into storage cells in racks located in Wolf Creek's spent fuel pool. The parties refer to this storage option as "wet storage." *Id.*

While Government performance should have begun in 1998, not all utilities would have expected recovery of their spent fuel at this time. *See Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1272–73 (Fed. Cir. 2008) (explaining the role of the Standard Contract acceptance rate). In this case, the record shows that the Govern-

ment's first scheduled collection of Wolf Creek's SNF would have been in 2006. *KG & E*, 95 Fed. Cl. at 260.

As early as 1993, the Kansas Companies anticipated they would need to pursue alternative storage options for Wolf Creek if DOE declined to accept spent fuel by 1998. *Id.* at 264. The Kansas Companies tasked Mr. Matthew K. Morris, the nuclear engineer responsible for administering the Standard Contract at Wolf Creek, with exploring options to create more available space in Wolf Creek's spent fuel pool. *Id.* Wolf Creek's Principal Engineer for Nuclear Fuels, Mr. Scott Ferguson, also researched additional storage options. *Id.* at 261, 296.

The Kansas Companies concluded their spent fuel storage study in 1995. The report evaluated six options: (1) plant operations/fuel design; (2) increased in-pool storage; (3) dry storage technologies; (4) shipment to private interim storage facilities; (5) shipment to a federal facility; and (6), combinations of the first five alternatives. *Id.* at 264. The report concluded that the best three options were reracking the storage pool, dry cask storage, or a combination of the two. *Id.* at 266.

The Kansas Companies ultimately decided to rerack the storage pool. *Id.* Under this option, they removed the existing racks from the pool, replaced them with higher density racks, and placed them closer together while still maintaining sufficient cooling flow. *Id.* The Kansas Companies installed the racks with the help of a contractor, Holtec International.

While conducting the rerack, the Kansas Companies both increased their storage capacity and used racks that could support higher enrichment fuel assemblies. Joint App. at 120; 311; 638-39. These higher enrichment fuel assemblies allowed Wolf Creek to achieve the same energy output from the reactor with fewer fuel assemblies.

This reduced the number of assemblies purchased and discharged. *Id.* at 122. The rerack project was completed in the spring of 2000. *KG & E*, 95 Fed. Cl. at 268.

Of course, the Government did not proceed to collect and dispose of SNF and HLW on January 31, 1998. This court has previously held that the Government thus partially breached the Standard Contract with the nuclear energy industry. *See N. States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000) and *Me. Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1343 (Fed. Cir. 2000). Therefore, the trial court in this case focused on the quantum of damages owed to the Kansas Companies on account of the Government's breach. The trial court found that even if the Government had not breached the Standard Contract, Wolf Creek would have run out of wet storage by 2005, "necessitating alternative storage measures." *Id.* at 278. Thus, the trial court, in applying this court's precedent in *Yankee Atomic Power Co. v. United States*, 536 F.3d 1268 (Fed. Cir. 2008), required the Kansas Companies to both prove their damages and show what costs, if any, they would have experienced absent the breach. *KG & E*, 95 Fed. Cl. at 273–74, 277.

The Kansas Companies presented numerous alternative storage measures they would have pursued in the non-breach world. The trial court found that the Kansas Companies would have pursued a low-cost measure wherein Wolf Creek would receive credit for the soluble boron already present in the water in the spent fuel storage pool. *Id.* at 295–96. Boron is a neutron absorber that can control the reactivity of spent fuel, and the Nuclear Regulatory Commission had issued "criticality credit" to several utilities for the boron present in their pools. This credit would have allowed Wolf Creek to store

fuel assemblies at a greater density, thus resolving its short-term storage issues.

The trial court also found that the Kansas Companies would have performed "a gate-drop analysis" in the non-breach world. *Id.* at 280, 298. Due to the structure of Wolf Creek's pool, 18 storage cells were directly under a large moveable gate which, if it accidently fell into the pool, could have damaged fuel assemblies stored below. *Id.* at 279-80. These storage cells could not be used without "doing the appropriate analysis to show that, if [the gate] was to drop, that it would not damage the fuel causing a release." *Id.* at 280. This analysis would have occurred in the non-breach world, allowing Wolf Creek to store fuel in these 18 cells. The trial court found such an analysis would have cost at least $100,000. *Id.* at 298.

After determining the costs in the non-breach world, the trial court examined the Kansas Companies' direct costs of mitigating the Government's breach. The trial court awarded $9.7 million for the rerack project, "less $100,000 in costs that [the Kansas Companies] minimally would have incurred but for the breach . . . ." *Id.* The trial court disallowed the Kansas Companies' claim for the costs associated with the alternative storage options study conducted by Messrs. Morris and Ferguson. Specifically, the trial court noted that Morris and Ferguson adequately accounted for their time in studying all options, but made "no effort . . . to apportion this time to the rerack alternative. . . ." *Id.* at 297.

The trial court also awarded overhead costs. The Kansas Companies divided overhead into three pools of costs: labor overhead ($160,467.99), material overhead ($260,725.47), and construction overhead ($3,420,935.18). *Id.* at 298. The parties did not dispute the labor overhead. *Id.* In operating Wolf Creek, the Kansas Compa-

nies account for overhead costs using a "total-cost alloca-tion method." *Id.* at 299. They have used this method since 1987, and the method complies with Federal Energy Regulatory Commission ("FERC") regulations regarding the allocation of costs between a particular capital project versus the applicable overhead account. *Id.* at 298–99.

The trial court concluded that the Kansas Companies' use of total-cost accounting was reasonable for business purposes, but stated that "what makes for good business accounting does not translate automatically into a fair and reasonable apportionment of damages." *Id.* at 308. The trial court found that the total-cost allocation method included the cost of construction materials in its base overhead rate, the inclusion of which "unreasonably inflates the amount of construction overheads." *Id.* at 309. Thus, the trial court reduced the Kansas Companies' construction overhead award by sixty percent, or the "approximate percentage amount of material charges relating to the rerack project compared with the total cost of the project." *Id.* Thus, this judgment awarded the Kansas Companies their requested labor and material overhead costs, but only $1,368,374.07 for construction overhead.

Lastly, the trial court found that the Kansas Companies realized a "real world savings" due to the ability to use higher enrichment fuel assemblies at Wolf Creek. *Id.* at 310. The net effect of the rerack was a savings of at least $800,000, and the trial court reduced the Kansas Companies' total award by this amount. The total award to the Kansas Companies was $10,632,454.83.

The Kansas Companies appeal the trial court's reduc-tion in damages for the supposed benefit they received from the new fuel racks. They also appeal the trial court's analysis of their construction overhead costs. Lastly, they

appeal the trial court's refusal to award damages for the costs of studying alternative storage options and for their costs of capital.

This court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## II.

This court reviews the factual findings of the Court of Federal Claims for clear error, *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369,1373 (Fed. Cir. 2005), including "the general types of damages awarded . . . , their appropriateness . . . , and rates used to calculate them . . .," *Home Savings of America v. United States*, 399 F.3d 1341, 1347 (Fed. Cir. 2005). "A finding may be held clearly erroneous when . . . the appellate court is left with a definite and firm conviction that a mistake has been committed." *Ind. Mich.*, 422 F.3d at 1373 (quoting *In re Mark Indus.*, 751 F.2d 1219, 1222–23 (Fed. Cir. 1984)). This court reviews the trial court's legal conclusions without deference. *Yankee Atomic*, 536 F.3d at 1272. This court provides the trial court with wide discretion in determining an appropriate quantum of damages. *Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1382 (Fed. Cir. 2004).

As a general rule, "[a] non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." *LaSalle Talman Bank, F.S.B., v. United States*, 317 F.3d 1363, 1371 (Fed. Cir. 2003) (citing 3 E. Allen Farnsworth, Farnsworth on Contracts 193 (2d ed. 1998)). *See also United States v. City of Twin Falls*, 806 F.2d 862, 873–74 (9th Cir. 1986) (contract damages to non-breaching party are reduced by gains after breach because contract damages seek only to "fairly compensate the injured party for his loss"); Restatement

(Second) of Contracts § 347 cmt. e ("The injured party is limited to damages based on his actual loss caused by the breach. If he makes an especially favorable substitute transaction, so that he sustains a smaller loss than might have been expected, his damages are reduced by the loss avoided as a result of that transaction.").

Damages do not extend to remote consequences of the breach. Similarly, mitigation efforts may result in direct savings that reduce the damages claim. *LaSalle*, 317 F.3d at 1371; *Citizens Fed. Bank, FSB v. United States*, 59 Fed. Cl. 507, 526 (2003) (finding that the benefits of mitigation must be credited to the government as the breaching party). Thus, "where the defendant's wrong or breach of contract has not only caused damage, but has also conferred a benefit upon plaintiff which he would not otherwise have reaped, the value of this benefit must be credited to defendant in assessing the damages." *LaSalle*, 317 F.3d at 1372 (quoting Charles T. McCormick, Handbook on the Law of Damages 146 (1935)).

The Kansas Companies claim the trial court erred in reducing their damages by $800,000 for the benefits they received from the rerack project, *i.e.*, the ability to use higher-enrichment fuel and purchase fewer fuel assemblies. The Kansas Companies claim that any benefit they received was too remote and not directly related to the breach because the decision to "pursue more highly enriched fresh nuclear fuel" was an "independent business decision" and influenced by the market price of uranium conversion, enrichment, and fabrication. Corrected Brief for Plaintiffs-Appellants 28–30. They also argue that the benefit was not immediate because it accrued over time as Wolf Creek procured fresh fuel for its reactor.

The trial court correctly reduced the Kansas Companies' damages to account for efficiency benefits from the

rerack project. First, the Kansas Companies acquired higher enrichment fuel as a direct consequence of the decision to rerack the wet storage pool. To alter either the storage configuration of the wet storage pool or the enrichment levels of fuel used at Wolf Creek, the NRC had to approve a license amendment. Joint App. at 358. In 1998, as part of its mitigation efforts, Wolf Creek sought NRC approval to both rerack its fuel storage pool and to use higher enrichment fuel assemblies. *See* Environmental Assessment, 63 Fed. Reg. 68,478 (Dec. 11, 1998) ("The proposed action would revise the [Wolf Creek] technical specifications to allow an increase in the [Wolf Creek] spent fuel pool (SFP) storage capacity and to allow an increase in the maximum nominal fuel enrichment to 5.0 nominal weight percent U-235."); Notice of Issuance of Amendment, 64 Fed. Reg. 14,950 (March 29, 1999) (granting the amendment to Wolf Creek's license).

The Kansas Companies' internal engineering and contract documents also confirm that the purpose of the rerack project was both to "increase Wolf Creek on-site spent fuel storage capacity and to allow an increase in the maximum allowable nominal fuel enrichment stored in the spent fuel pool to 5.0 [nominal weight percent] U-235." Joint App. at 638–39. Indeed, Mr. Richard Muench, former President and Chief Executive Officer of Wolf Creek, testified that the Kansas Companies conducted an evaluation to show it was more economical to switch to higher enrichment fuel, and that they took "the opportunity to go to the higher enrichment **at the same time** we were switching our racks." *Id.* at 310–11 (emphasis added). Thus the record shows that the decision to pursue higher enrichment fuel assemblies was not an independent business decision but part and parcel of the Kansas Companies' mitigation efforts.

The record also shows that the higher enrichment fuel assemblies produced a real-world benefit. Mr. Morris testified that the new racks allowed Wolf Creek to use higher enrichment fuel assemblies and thus to purchase fewer assemblies. *KG & E*, 95 Fed. Cl. at 310; Joint App. at 122. Mr. Muench confirmed that the net effect of switching Wolf Creek to higher enrichment fuel was a savings of "hundreds of thousands of dollars per cycle," and that at least four fuel cycles had occurred since mitigation. *KG & E*, 95 Fed. Cl. at 310; Joint App. at 311. The trial court found that this constituted a "real-world savings," and accordingly reduced the damages. This court does not lightly disturb such a factual finding. *Cf. Citizens Bank v. United States*, 66 Fed. Cl. 179, 204 (2005) (denying the government's request to reduce damages in a *Winstar* case because, while the government was entitled to reduction in damages for any benefit obtained through the breach as a matter of law, the thrift "did not in fact realize any of these benefits").

The Kansas Companies' argue that this benefit was too remote because it accrued over time as influenced by market forces. As noted above, the Kansas Companies chose at the time of the breach and mitigation to pursue higher enrichment fuel assemblies. The long-term benefit of fuel cost savings does not sever its connection to the Kansas Companies' mitigation efforts.

This court upheld a similar damages determination in *LaSalle Talman Bank*, a *Winstar* case. Talman Bank, in mitigation of the Government's breach of contract, received a cash infusion of $300 million. Because the cash infusion was a direct result of the Government's breach, this court upheld a reduction in damages to account for benefits arising from the infusion. 317 F.3d at 1373–74. Ultimately, the benefit was calculated as the earnings generated by the $300 million cash infusion from 1992

(the date of mitigation) to 2003. *LaSalle Talman Bank, F.S.B., v. United States*, 64 Fed. Cl. 90, 112-13 (2005), *aff'd*, 462 F.3d 1331 (Fed. Cir. 2006). This court did not change that reduction even though the plaintiff's earnings resulted from uncertain market forces over time. The same result applies in this case.

By enhancing the racks to accommodate high-enrichment fuel assemblies, the Kansas Companies mitigated the Government's breach in a way that produced a benefit. While the passage of time causes greater realization of the benefit and market forces may influence a future valuation of the benefit, the Kansas Companies have, as of the time of this litigation, received a benefit as a direct result of their mitigation activity. Thus, the trial court correctly reduced the Kansas Companies' damages by the amount of the benefit received in mitigating the Government's partial breach of the Standard Contract.

This court's precedent in *Dominion Resources, Inc. v. United States*, 641 F.3d 1359 (Fed. Cir. 2011) does not alter this decision. In *Dominion*, the government asserted that because "Dominion's one-time [disposal] fee was not yet payable because of the government's breach, Dominion may have profited by having use of the money in the meantime." *Id.* at 1364. This court affirmed the trial court and refused to allow the government to question whether Dominion received a benefit, but it did so as a matter of contractual interpretation. *Id.* at 1364–65. The Standard Contract provides options for the payment of the fee and expressly states that if the utility chooses to wait to pay the fee, interest is to be calculated "from April 7, 1983, to the date of the payment based upon the 13-week Treasury bill rate." *Id.* at 1364. Because the parties agreed ex ante to a one-time fee with interest at the thirteen-week Treasury bill rate, Dominion could not "ask for increased damages should its investment of the one-

time fee return less than the thirteen-week rate, and the government [could not] ask for a reduction in damages should Dominion's investments return more." *Id.* at 1365. This case does not feature the contractual concerns that governed the *Dominion* case.

III.

The Kansas Companies incurred overhead costs when managing their rerack operations to mitigate the breach. The Kansas Companies maintain an accounting system which tracks and apportions all overhead costs. The accounting system, termed "a total-cost allocation methodology," uses a two-step process to determine the percentage overhead rate.

In the first step, the capitalized administrative costs, indirect labor costs, and labor overheads on indirect labor for each department are split between capital projects and plant operations based on the amount of work the department does to support each of those functions. *KG & E*, 95 Fed. Cl. at 299; Joint App. at 416–17. The portion assigned to capital projects is called the "available to allocate pool." For example, the Kansas Companies' accounting department allocated 6% of the CEO's time towards construction projects, and 94% of his time to plant operations. Joint App. at 418. Thus, 6% of the CEO's labor costs were allocated towards the plant's total construction overhead.

Next, the available to allocate pool is divided by the total costs of the planned capital projects for the year for the capital budget. *KG & E*, 95 Fed. Cl. at 300. This equation yields the construction overhead rate. The end result of the total cost allocation method is that the largest capital projects receive the largest share of the overhead pool allocations, while smaller capital projects receive smaller allocations. *Id.*

The Kansas Companies make these calculations annually. Joint App. at 416–17. However, throughout any given year, these calculations are compared against actual expenditures on direct costs to account for any discrepancies. Review of the overhead rate occurs on at least a quarterly basis. *KG & E*, 95 Fed. Cl. at 300.

The Kansas Companies have used the "total-cost allocation method" for material overhead and construction overhead calculations since 1987. *Id.* at 299–300. This accounting method complies with FERC accounting regulations. FERC requires that all major electric utilities meet certain accounting standards called the Uniform System of Accounts. *See* 18 C.F.R. § 101 (2012). The standards require utilities to use an accounting system that properly measures, inter alia, direct and indirect overhead construction costs. *Id.* The records must "be so kept as to show the total amount of each overhead for each year, the nature and amount of each overhead expenditure charged to each construction work order and to each electric plant account, and the bases of distribution of such costs." *Id.* In this case, the record shows that the Kansas Companies' cost accounting method complied with FERC regulations. *KG & E*, 95 Fed. Cl. at 298.

As explained in *Indiana Michigan*, "damages for breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." 422 F.3d at 1373 (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)). Once a company has proved that certain work was undertaken because of the breach, it may proceed to prove the amount of the associated cost (including both direct and indirect costs) by any available and reasonable technique. *Energy Nw. v. United States*,

641 F.3d 1300, 1309 (Fed. Cir. 2011). These reasonable techniques need not prove damages with Cartesian certainty. *Id.* (citing *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 350 F.3d 1327, 1345 (Fed. Cir. 2003)).

This court upholds an internal accounting system as showing overhead costs with reasonable certainty when it allocates a portion of the expenses to a particular project using codes, *Carolina Power & Light Co. v. United States*, 573 F.3d 1271, 1276-77 (Fed. Cir. 2009), when it allocates according to accepted accounting principles, *Energy Nw.*, 641 F.3d at 1309, and when it allocates with accounting procedures that comply with mandatory FERC regulations, *System Fuels, Inc. v. United States*, 666 F.3d 1306, 1311-12 (Fed. Cir. 2012). *See also*, Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, --- F.3d ----, 2012 WL 2126813, at *15–16 (Fed. Cir., June 13, 2012) (reversing the Court of Federal Claims when it denied damages for overhead costs despite acknowledging that the utility's accounting practices followed GAAP and FERC regulations); *Consolidated Edison Co. of N.Y., Inc. v. Entergy Nuclear Indian Point 2, LLC*, 676 F.3d 1331, 2012 WL 1284402, at *7–8 (Fed. Cir. 2012) (reversing the Court of Federal Claims' denial of damages for overhead costs when the utility proved the costs with a separate accounting system compliant with FERC regulations).

This case bears strikingly similarity to *System Fuels* and *Consolidated Edison*. In each of these cases, the utilities in question maintained a separate accounting system to allocate overhead costs, and these accounting methods were compliant with FERC regulations and generally accepted accounting principles ("GAAP"). *Consolidated Edison*, 2012 WL 1284402, at *7; *Sys. Fuels*, 666 F.3d at 1311. In each of these cases, the trial court found that the method employed by the utilities was "imprecise," resulting in inflated overhead costs, and it

denied portions of the utilities' overhead costs as a result. In each of these cases, this court reversed the trial court, holding that where the utilities used accounting procedures as mandated by FERC and consistent with GAAP, the utilities' accounting records sufficiently demonstrated damages with reasonable particularity. *Consolidated Edison*, 2012 WL 1284402, at \*7; *Sys. Fuels*, 666 F.3d at 1312.

In light of this record, the trial court erred by denying the Kansas Companies a portion of their overhead damages calculated via the total-cost allocation method. The Kansas Companies used an internal accounting system which coded costs to specific projects, the allocation rates were re-examined on a regular basis in order to reflect actual capital project costs, and the total-cost allocation method complied with required FERC accounting regulations. The trial court explicitly recognized that the total-cost allocation method was a "reasonable" technique, stating: "the court has no quarrel with [the Plaintiffs' damages expert's] characterization of Wolf Creek's use of the total-cost method as a reasonable form of cost accounting for business purposes. The fact that Wolf Creek has used this method since 1987 confirms this point." *KG & E*, 95 Fed. Cl. at 308. Therefore, this court reverses the trial court's denial of damages for overhead costs calculated via the total-cost allocation method as inconsistent with precedent and the record.

## IV.

The Kansas Companies also appeal the trial court's denial of damages for the costs of a report authored by Messrs. Morris and Ferguson. The report, begun in 1994, analyzed nearly two dozen spent fuel storage options. Joint App. at 101, 364, 597. While the total hours spent by Messrs. Morris and Ferguson in preparing the report

were adequately accounted for, the trial court stated that "[b]ecause no effort was made to apportion this time to the rerack alternatives, the court disallows the additional Morris and Ferguson labor." *KG & E*, 94 Fed. Cl. at 297.

Viewing the record as a whole, this court notes that the trial court found, and the Kansas Companies have not challenged, that the first scheduled collection of Wolf Creek's spent fuel in the non-breach world would have occurred in 2006. *Id.* at 278. But, as the trial court also found, "2006 would have been one year too late for Wolf Creek; by spring 2005, accumulating SNF would have overcome Wolf Creek's dwindling available storage, necessitating alternative storage measures." *Id.* The trial court concluded that, after reviewing its options, Wolf Creek most likely would have pursued using soluble boron to lower the reactivity of the storage pool, thus mitigating its dwindling storage capacity.

Thus, the record shows that Wolf Creek would have had to pursue alternative storage measures in both the breach and non-breach worlds. In other words, it would have needed similar research in both worlds to determine future options. The trial court denied breach world damages for the costs of such research "[b]ecause no effort was made to apportion this time to the rerack alternatives . . . ." *Id.* at 297. In other words, the Kansas Companies did not meet their burden of proving any overlap between the costs of studying alternative storage options in the breach versus the non-breach worlds. Without record evidence about the research costs in both worlds, the trial court could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the damages. *See Yankee Atomic Elec. Co.*, 526 F.3d at 1273; *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed. Cir. 2001) (instructing that plaintiffs bear the burden of demonstrating "what

might have been"); *Bluebonnet Sav. Bank FSB v. United States,* 67 Fed. Cl. 231, 238 (2005) ("[B]ecause plaintiffs in this case are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but-for' world."). Thus, the Court of Federal Claims did not err in disallowing damages for the spent fuel storage study.

## V.

The Kansas Companies also appeal the trial court's denial of damages for the cost of capital to fund its mitigation activities. The utilities seek to recover $466,977 in cost-of-capital damages for the financing of the breach-related projects.

In *Energy Northwest*, this court held that the no-interest rule barred parties to the Standard Contract from recovering the costs of financing mitigation projects. 641 F.3d at 1310–13 (citing 28 U.S.C. § 2516(a)); *see also Sys. Fuels*, 666 F.3d at 1310–11. In *Boston Edison Co. v. Untied States*, the court held that the "commercial enterprise exception" to the no-interest rule did not apply in the context of the NWPA. 658 F.3d 1361, 1371 (Fed. Cir. 2011). Consistent with these decisions, this court affirms the trial court's denial of the Kansas Companies' cost of capital claims.

## VI.

The Kansas Companies' method for calculating overhead costs was reasonable and complied with FERC accounting standards. As such, this court reverses the trial court's refusal to accept these calculations. This court affirms the remainder of the trial court's decision. As such, there is no need to address the issues raised in the Government's cross-appeal.

**AFFIRMED-IN-PART AND REVERSED-IN-PART**


COSTS

Costs to Plaintiffs-Appellants.

# United States Court of Appeals for the Federal Circuit

---

**KANSAS GAS AND ELECTRIC COMPANY,
KANSAS CITY POWER & LIGHT COMPANY,
AND KANSAS ELECTRIC POWER COOPERATIVE,
INC.,**

*Plaintiffs-Appellants,*

**v.**

**UNITED STATES,**

*Defendant-Cross Appellant.*

---

2011-5044, -5045

---

Appeals from the United States Court of Federal Claims In No. 04-CV-099, Judge Christine O.C. Miller.

---

LINN, *Circuit Judge*, dissenting in part.

The majority concludes that when the Kansas Companies used Federal Energy Regulatory Commission ("FERC")-compliant accounting practices to allocate overhead to their mitigation efforts, they were dispositively entitled to recover the full amount of that overhead as damages. I respectfully disagree. When, as here, a trial court is presented with evidence that regulatory-accounting practices were used to calculate the amount of overhead attributable to mitigation projects, that amount is presumptively a correct measure of damages for overhead. And our precedent firmly establishes that a trial

court is not free to disregard it simply because it questions the precision of the accepted accounting practice. But the fact that a regulatory-compliant accounting practice is followed should not prevent a trial court from considering other record evidence showing that the amount claimed as damages based on such accounting practice is grossly disproportionate to the actual damages incurred. Nor does it overshadow the substantial discretion a trial court enjoys in crafting its damages award or the clear error standard of review applicable to fact questions such as this.

Here, the United States Court of Federal Claims ("trial court") did not disregard evidence of accepted accounting practices. Rather it determined, in view of the record as a whole, that in this case such practices reflected an overhead amount that was a demonstrably inaccurate reflection of the damages incurred. Rather than simply deny overhead damages altogether, the trial court used all of the evidence of record to craft a more correct and therefore more reasonable award. In so doing, the trial court carefully considered the record in general, and the testimony of the experts in particular, in treating as an issue of first impression the question of whether the total-cost overhead allocation methodology provided a correct measure of damages. *Kan. Gas & Elec. Co. v. United States*, 95 Fed. Cl. 257, 307 (2010). In analyzing this question, the trial court first observed that plaintiffs' damages expert, Professor Jerold Zimmerman, who testified that this methodology was reasonable and for a "valid business purpose":

> never asked for or was given Wolf Creek's raw financial data, nor did he talk with Wolf Creek's accounting personnel. . . . [Nor was he asked] to review whether Wolf Creek's $3.7 million in claimed construction and material overheads derived from the correct measure of damages. Tr.

at 1865. In fact, Prof. Zimmerman admitted that he was not "charge[d]" with "opining on the numbers" . . . . Tr. at 1883 ("Well I didn't have to [review Wolf Creek's raw financial data] to assess the logical flaws in [defendant's expert,] Mr. Johnson's report. Since I wasn't opining on the numbers, one can look at the logical analysis and say whether the logic is correct without actually looking and testing the numbers.").

*Id.* The trial court also looked to the testimony of defendant's expert, R. Larry Johnson, and noted:

Mr. Johnson testified that the total-cost method is not widely used in the cost accounting community. Tr. at 1705-06 (citing, *inter alia*, Professor Zimmerman's cost accounting textbook analysis of a survey of allocation methodologies using 293 respondents in which total-cost method does not appear). . . . Mr. Johnson analogized how the total-cost method creates disproportionate overheads to the use of "gold wire" rather than steel in constructing a wheel. If five different projects each had $100.00 in labor overhead, a total of $500.00 in direct labor would be allowed, and each project would receive a twenty percent (or $20.00) allocation of overhead based on the labor. Mr. Johnson then added the material costs of steel wire to four of the five projects costing $10.00 each, but the fifth project used gold wire costing $1000.00. Because the amount of labor expended remains constant, the fifth project does not consume more overhead resources. However, under the total-cost

allocation, four of the projects would receive a $7.00 overhead allocation rather than $20.00, and the gold wire project would receive $72.00.

*Id.* at 306.

Based on a meticulously-documented examination of the *factual record*, the trial court explained that it had:

no quarrel with [the] characterization of Wolf Creek's use of the total-cost method as a reasonable form of cost accounting for business purposes. . . . However, what makes for good business accounting does not translate automatically into a fair and reasonable apportionment of damages. . . . [Rather,] the allocation method used to calculate these overhead amounts must bear some relationship to the resources actually expended. In cross-examining Mr. Robke, [who was responsible for accounting on the rerack project,] defendant established that the construction material costs—that is, the cost of the racks—bore no relationship to Wolf Creek's resources expended on the rerack project. . . . [T]he exchange with Mr. Robke shows that, if the racks did—hypothetically—cost $12 million rather than $6 million, the total-cost allocation methodology doubles the overhead allocated for those materials without any actual change in internal resources. . . . The material cost of the rerack project clearly was not the driver of the construction overheads, and it did not affect the internal support provided to the project.

*Id.* at 308.

The trial court thus determined "that the total-cost method's inclusion of the cost of construction materials in its allocation base unreasonably inflates the amount of construction overheads" and, on the facts found, cannot be solely relied upon to support a reasonable damages award. *Id.* at 309.

I see no error, let alone clear error, in the trial court's careful treatment of the evidence in making its reasonable damages determination. The majority points to no clear error and, indeed, makes only passing reference to the record in its analysis. Without addressing the expert testimony or the trial court's findings of fact, the majority concludes that because "[t]he Kansas Companies used an internal accounting system which coded costs to specific projects, [because] the allocation rates were re-examined on a regular basis in order to reflect actual capital project costs, and [because] the total-cost allocation method complied with required FERC accounting regulations" the trial court's "denial of damages for overhead costs . . . [was] inconsistent with precedent and the record." Maj. Op. at 16. While the majority's statements all sound eminently reasonable, they fail to consider the real issue. As noted above, the trial court did not take issue with the accounting method as being reasonable, nor with the premise that it was accurately *applied.* Rather, it rested its decision on the observation that if plaintiffs were allowed to include the cost of disproportionately expensive materials in the total cost analysis, the government unreasonably would be held responsible for costs that had nothing to do with the capital project to which they had been attributed or with the government's breach. To this point, the trial court quoted the testimony of Mr. Johnson, who explained:

> Did [Wolf Creek's] accounting department incur more costs because [they] bought $6 million in casks? Did [Wolf Creek's] human resources department incur more

> costs because [they] bought $6 million in casks? And the answer I think to those things has to be "no."

95 Fed. Cl. at 308-9. As the trial court then stated, "Plaintiffs failed to rebut this argument." *Id.* at 309. Thus, the whole point of the trial court's explanation is that even *assuming* plaintiffs correctly used the total-cost methodology to calculate overhead, the resulting damages request, given the facts of this case, was simply wrong.

The majority does not address the evidence or the trial court's reasoning based on the record, but instead relies on *System Fuels, Inc. v. United States*, 666 F.3d 1306 (Fed. Cir. 2012), and *Consolidated Edison Co. of New York v. Entergy Nuclear Indian Point 2, LLC*, 676 F.3d 1331 (Fed. Cir. 2012), to elide the significance of the facts found. In my view, neither *System Fuels* nor *Consolidated Edison* supports such treatment because neither of those cases can be fairly read to stand for the proposition that once it is established that an accepted accounting method was used, the trial court's role in finding the correct measure of overhead damages is at an end. And nothing in either case says that the trial court must disregard contrary evidence once accounting compliance has been shown.

In *System Fuels*, this court explained that the trial court clearly erred when it found that records of generally accepted accounting practices "did not demonstrate the effect of the mitigation project on [overhead pools] with reasonable particularity." *System Fuels*, 666 F.3d at 1312 (quotations omitted). But there, the trial court refused to award any amount merely because "[p]laintiffs . . . were unable to verify *exactly* what portion of the capital suspense loader was incurred for work *exclusively* on [the mitigation project]." *System Fuels, Inc. v. U.S.*, 78 Fed. Cl. 769, 800 (2007) (emphasis added). Similarly, in *Consolidated Edison*, this court applied *System Fuels* in rejecting the trial court's determination that accepted

accounting methodology was "too 'imprecise.'" *Consol. Edison*, 676 F.3d at 1340 (citation omitted). The trial court's annunciation of a "precision" requirement there was tantamount to an incorrect gloss on the reasonable certainty requirement in our damages cases, *see, e.g., Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005), and was properly reversed as such. In any case it was a far cry from a specific, grounded, *factual* determination, as the trial court made here, demonstrating that the plaintiffs' proposed measure of damages was not merely *approximate*, but actually and plainly *wrong*.[1]

These cases establish that business-reasonable accounting methods are good evidence of damages. But neither case establishes that when evidence of the use of a generally accepted method of accounting is present, the

---

[1] The majority also relies upon this court's recent reversal of the trial court in *Vermont Nuclear Power Corp. v. Entergy Nuclear Vermont Yankee*, --- F.3d ----, 2012 WL 2126813 (Fed. Cir. June 13, 2012) to support its contention that GAP and FERC-compliant accounting is *per se* proof of the correct measure of overhead damages. This reliance is equally misplaced. There, the trial court had refused to allow *any* damages for the portion of an overhead pool attributed to breach-related projects by accepted accounting practices because imprecision in the calculation of the total overhead pool made "the recovery of capital suspense loader charges dubious." *Entergy Nuclear Vt. Yankee, LLC v. United States*, 95 Fed. Cl. 160, 194-95 (2010) (quotation omitted). But unlike *Entergy Nuclear*, the trial court here did not merely disregard accepted accounting practices as "imprecise." Instead, it looked to the record as a whole and determined that while recovery of overhead damages *was* appropriate, it was necessary to adjust the requested amount in order to correct a *known* and *specific* inaccuracy.

trial court need not consider relevant evidence of aberrant results stemming from the use of such method.  Nor could they:  Our precedent states that "[d]amages for a breach of contract are recoverable where . . . [in relevant part] the damages are shown with *reasonable certainty*."  *Id.* (emphasis added).  Nothing prohibited the trial court from *adjusting* its damages award even though it was *reasonably certain* that the requested amount was *wrong*.

Evidence that generally accepted accounting practices were followed does not obviate examination of the underlying facts and should not nullify the trial court's role as the weigher of evidence, the finder of facts, and the crafter of reasonable damages awards.  Here, the trial court properly fulfilled that role, and nothing in the majority's opinion suggests that the trial court's assessment of the *facts* was clearly erroneous.

Because the trial court's fact-finding as to overhead was not clearly erroneous, and because its reduction of the requested amount was not an abuse of its discretion, I would affirm the trial court's overhead award.  For these reasons, I respectfully dissent from section III of the majority opinion.